# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-119V
### Filed: June 11, 2026

|  |  |
|---|---|
| DEMETRIUS LOCKETT, <br><br> Petitioner, <br><br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Special Master Horner |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA, for petitioner.*
*Hana Shatila, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION[1]

On February 4, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a Table Injury of a Shoulder Injury Related to Vaccine Administration ("SIRVA") affecting his left shoulder and following an influenza ("flu") vaccination he received on October 21, 2019.  (ECF No. 1.)  Alternatively, petitioner pleads a shoulder injury caused-in-fact by his vaccination.  (*Id*. at 6.)  For the reasons set forth below, I conclude that petitioner is *not* entitled to compensation.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

## I.     Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by* 42 C.F.R. § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAI"), which provide a more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," a petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)     No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or

diagnostic studies occurring after vaccine injection;

(ii)     Pain occurs within the specified time-frame;

(iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)     No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence."  § 300aa-13(a)(1).  That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence."  *Moberly*, 592 F.3d at 1322 n.2 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. of S. Cal.*, 508 U.S. 602, 622 (1993)).  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a

decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II.    Procedural History

Petitioner initially filed medical records and a written statement marked as Exhibits 1-8. (ECF No. 6.) He filed his Statement of Completion on February 28, 2022. (ECF No. 8.) Thereafter, the case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases which, based on the allegations in the petition, have a high likelihood of informal resolution. (ECF Nos. 9-10.) However, respondent filed a Rule 4 Report seeking to defend the case (ECF No. 19), and this case was then reassigned to the undersigned (ECF Nos. 20-21). While the case was pending in the SPU, petitioner filed additional medical records marked as Exhibits 9-10. (ECF No. 17.)

After the case was reassigned, petitioner filed expert reports by neurologist Joseph Jeret, M.D., and orthopedist Bret Cascio, M.D. (ECF No. 25; Exs. 11-16.) Respondent responded with expert reports by neurologist Brian Callaghan, M.D., and orthopedist Geoffrey Abrams, M.D. (ECF No. 28; Exs. A-D.)

Petitioner filed a motion for a ruling on the written record on March 3, 2025. (ECF No. 32.) Respondent filed his response on May 15, 2025, and petitioner filed a reply on June 16, 2025. (ECF Nos. 34-35.) In his motion, petitioner requests that the court rule that the evidence preponderates in favor of findings that petitioner received the vaccination at issue in his left shoulder, that he experienced onset of left shoulder pain within 48 hours of that vaccination, and that his injury meets the requirements for a Table Injury of SIRVA. (ECF No. 32, p. 41; *see also* ECF No. 35, pp. 39-40.) Alternatively, petitioner argues that he has demonstrated that his left shoulder injury was directly and proximately caused by the flu vaccination in accordance with the *Althen* test. (ECF No. 32, p. 41; *see also* ECF No. 35, pp. 39-40.) Respondent argues for contrary findings on all of these points and requests that petitioner's claims be denied. (ECF No. 34.)

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

### III.    Factual History

Prior to the vaccination at issue, petitioner had a history of left hip pain following a prior car accident, which left him disabled.  (Ex. 7, p. 38; Ex. 2, p. 5; Ex. 1, p. 46.)  Respondent asserts that petitioner's prior history included left arm and shoulder pain, as well as left hip pain.  (ECF No. 34, p. 3 (citing Ex. 7, p. 38).)  However, the record respondent cites was a later medical record created after the onset of what petitioner alleges to have been a SIRVA.  It appears that in recording petitioner's history, the physician may have at that time conflated these two different histories.  (*Compare* Ex. 7, p. 38, *with* Ex. 8, p. 8.)  At the primary care encounter at which petitioner received the subject vaccination, his injury related to the car accident is explicitly discussed as being related only to his left hip, though a subsequent record also noted a left wrist injury with scars related to the accident.  (Ex. 1, pp. 39-40, 46-48.)

Petitioner received the vaccination at issue at a primary care encounter on October 21, 2019.  (Ex. 1, pp. 4, 48.)  Petitioner's medical record documents that the vaccine was administered in his right shoulder (*Id.*); however, petitioner argues that the evidence overall preponderates in favor of a left shoulder administration (ECF No. 35, pp. 7-12).  Respondent disagrees.  (ECF No. 34, p. 11.)  On this record this represents a close question.  Ultimately though, it is not necessary to resolve that question because, even granting petitioner the assumption that he was vaccinated in his left shoulder, his injury claim fails for other reasons.

In his written statement, petitioner indicates that, following vaccination,

> The next day, I woke up in the morning with a sudden onset of severe pain in my left arm and shoulder.  The pain felt like my arm was on fire and I became increasingly distressed about what was happening.  I could not get out of bed or move my arm all day.  Additionally, my entire left arm felt itchy and swollen.  I told myself that if the pain did not subside by 10 p.m., I would call for an ambulance.  Luckily, the pain became less severe around 8-9 p.m. after taking Tylenol, but I was still in pain.

(Ex. 2, p. 2.)  He further recalled that, by the following day, the pain was "more stable" but still not back to normal.  (*Id.*)  He continued to feel tingling and pain throughout the shoulder, and he made a follow up medical appointment at that time.  (*Id.* at 1-2.)

Petitioner first presented for care of this condition on November 14, 2019, just over three weeks post-vaccination.  (Ex. 1, pp. 39-41.)  At that time, he reported:

> pt states that a couple of days after he got his flu shot at last visit, he felt that his whole L arm was on fire, was in a lot of pain, pt thought he was going to die.  The pain started to disappear a couple of hours later after pt took some tylenol, but the [numbness/tingling] continues to come in his forearm and hand whenever he uses his fingers.

5

(*Id.* at 39.)[3]  Petitioner's musculoskeletal exam showed that his cervical spine was normal with full range of motion and no swelling or deformity.  (*Id.*)  A further examination of his extremities noted that he had no decrease in strength in any of his arms or legs; that he had full range of motion of both shoulders, elbows, and wrists; and that his sensation was intact from the shoulders downward.  (*Id.*)  He was diagnosed with paresthesia of the skin, with an additional note that he might have a nerve impingement at the cervical spine, shoulder, elbow, or wrist.  (*Id.* at 40.)  X-rays of the spine, shoulder, elbow, and wrist were ordered.  (*Id.*)  His physician felt his finger symptoms could be related to the wrist injury he sustained in the prior car accident.  (*Id*.)

Petitioner followed up again with his primary care provider on January 29, 2020.  (Ex. 1, pp. 29-31.)  The history provided was substantially the same, reporting two months of numbness, tingling, and burning sensation in the arm and forearm, and the review of systems noted numbness and tingling of the left arm and forearm; however, the physical exam was unremarkable.  (*Id*. at 29-30.)  Petitioner's x-rays of the wrist, elbow and shoulder were all noted to be normal, but his x-ray of the spine showed degenerative arthritis at C5-C7.  (*Id*. at 30.)  The assessment was again paresthesia, which was noted to be intermittent.  (*Id.*)  Petitioner was referred to neurology with a recommendation for an EMG of the left arm.  (*Id.*)  About three months later, petitioner returned to his primary care office, requesting a new neurology referral due to insurance issues.  (*Id.* at 19.)  It was noted that his symptoms were unchanged.  (*Id.*)

Petitioner was later evaluated by a neurologist on July 16, 2020, with a complaint of pain and numbness in his left arm.  (Ex. 8, pp. 7-9.)  The history provided at this encounter is generally consistent with what petitioner had previously described, though this encounter record is internally inconsistent in noting which arm and shoulder were affected.  (*Id*.)  Petitioner described his pain as burning and as involving the shoulder, dorsal aspect of the arm and forearm, and the whole hand.  However, he denied neck pain.  (*Id*. at 8.)  On physical exam, petitioner had normal tone, muscle bulk, and strength in all muscle groups, except for left hand grip, thumb opposition, and left fifth digit abduction, all of which were measured at 4/5.  (*Id*.)  He also had decreased sensation to pinprick in a left ulnar distribution and hyperreflexia in the left upper biceps and brachioradialis.  (*Id*.)  A cervical spine MRI and EMG/NCS were recommended with a differential diagnosis of cervical radiculopathy versus neuropathy, potentially ulnar and median entrapment.  (*Id*. at 9.)

Thereafter, petitioner switched to a different neurologist, returning for care on September 9, 2020.  (Ex. 4, pp. 39-43.)  This record confirms petitioner did not follow through with the recommended EMG.  (*Id.* at 41.)  At this time, petitioner provided the following history:

---

[3] Petitioner also reported his condition to his clinical therapist on multiple occasions.  He similarly reported that he experienced excruciating pain "[a] few days" after his vaccination and that, having had prior flu vaccinations, these symptoms were "new and unfamiliar."  (Ex. 1, p. 43.)  Although the pain subsided after a day, the tingling sensation continued.  (*Id.*; *see also id.* at 36 (December 5, 2019 encounter again noting tingling); *id.* at 24 (February 26, 2020 encounter).)

> The patient indicated that in 10/25/2019 he received a flu shot.  After that, he had some itching in the arm and swelling in the lower arm.  The patient after that felt that the arm was stiff and slowly improved. . . . Indicated that he was thinking to get some job, but he is not working at the present.  He claims his left hand [is still] weak.

(*Id.* at 41.)  The physical exam did not document any abnormality, no diagnosis was given, and no further testing was recommended.[4]  (*Id.* at 43-44.)  However, when petitioner returned on November 6, 2020, it was noted that he had undergone a left shoulder ultrasound that was noted to have been unremarkable, apart from mild swelling.  (*Id.* at 31.)  At that time, petitioner reported that he "[d]oes not have much pain but has burning sensation in the left arm."  (*Id.*)  A review of systems documented that petitioner was negative for musculoskeletal complaints.  (*Id.*)  Physical exam again did not document any abnormality, but this time, petitioner was diagnosed with left shoulder tendonitis and left arm numbness.  (*Id*. at 32-33.)  An EMG was again recommended.  (*Id*.)  A subsequently performed EMG of November 27, 2020, was normal (*Id*. at 23-24) as was a corresponding physical exam (*Id*. at 22-23).

Petitioner followed up with the neurologist via telehealth on January 27, 2021.  (Ex. 4, pp. 11-13.)  He complained of continued left shoulder pain, noting that it hurts when lifting heavy objects.  (*Id*. at 11.)  Review of systems again documented a lack of musculoskeletal complaints.  (*Id*.)  Physical exam noted normal strength, bulk, and tone of all four extremities but also observed that, while petitioner was able to raise both arms all the way up, he had mild discomfort on the left side.  (*Id*. at 12.)  No diagnosis or orders were documented.  (*Id.* at 13.)

On June 4, 2021, petitioner returned to his primary care provider for a comprehensive exam.  (Ex. 7, pp. 38-43.)  At that time, it was noted that petitioner was being followed by neurology for chronic left shoulder pain.  (*Id*. at 38.)  Petitioner indicates in his written statement that his provider confirmed during this encounter that his shoulder pain was probably due to his vaccination (Ex. 2, p. 4); however, nothing in the medical records documents this.  Review of systems was positive for joint pain and myalgias, and physical exam demonstrated tenderness to palpation at the left anterior shoulder, as well as exacerbation of pain with cross arm testing.  (Ex. 7, p. 41.)  Additionally, petitioner had 4/5 grip strength of the left hand.  (*Id*. at 41.)  However, range of motion of the shoulder was normal.  (*Id*.)  Cervical spinal exam showed normal range motion.  (*Id*.)  Petitioner was told to follow up with neurology regarding his chronic left shoulder pain.  (*Id*. at 43.)  The following month, he requested a referral to neurosurgery.  (*Id*. at 19.)

However, on December 15, 2021, petitioner presented to an orthopedist.  (Ex. 6, pp. 9-10.)  Petitioner reported that his left shoulder had been hurting ever since

---

[4] Although no diagnosis was described within the encounter notes, a separate page in the medical records suggests petitioner was diagnosed with both tendonitis of the left shoulder and brachial plexopathy.  (Ex. 4, p. 39.)

7

vaccination and that his pain is 8 out of 10 in intensity, radiating to the left forearm, and increasing with activity and movement.  (*Id.* at 9.)  Physical exam showed mild tenderness and a 70% reduction in range of motion with muscle strength of 3/5, but with intact sensation and no atrophy.  (*Id.*)  X-rays showed moderate degenerative joint disease, and petitioner was diagnosed with primary osteoarthritis of the left shoulder.  (*Id*. at 10.)  In connection with this encounter, petitioner completed a HIPAA release form authorizing release of his records to his lawyer.  (*Id*. at 6.)

## IV.    Expert Opinions

On petitioner's behalf, orthopedist Bret Cascio, M.D.,[5] concludes that "[p]ain in the vaccinated shoulder, usually within 48 hours, is a hallmark sign of a SIRVA injury.  As such, I opine that there is a clear temporal relationship between [petitioner's] vaccination and the onset of symptoms that is well in line with the typical guidelines and requirements of SIRVA cases."  (Ex. 13, p. 8.)  Relying on the opinion of petitioner's expert neurologist, Joseph Jeret, M.D.,[6] as ruling out any neurologic cause for petitioner's condition, Dr. Cascio notes that "[s]houlder dysfunction can cause symptoms in the distal extremity even in the absence of a nerve injury, as occurred in this case."  (*Id*. at 8-9.)  Specifically, Dr. Jeret opined that petitioner's injury does not constitute either a cervical radiculopathy or a peripheral nerve injury because neurologic examinations never showed any atrophy, decrease in reflexes, or definite sensory loss.  (Ex. 11, p. 6.)  Moreover, the EMG/NCS was normal and petitioner did not have neck pain.  (*Id.*)  And, although minor trauma can cause Complex Regional Pain Syndrome ("CRPS"), which results in continuous, disproportionate pain, petitioner's presentation otherwise lacks necessary features that would support such a diagnosis.  (*Id*.)  Thus, Dr.

---

[5] Dr. Cascio received his medical degree from Louisiana State University School of Medicine in 2001, before going on to complete an orthopaedic surgery residency at Johns Hopkins Hospital in 2006, followed by a sports medicine fellowship at Steadman-Hawkins Clinic in Vail, Colorado, in 2007.  (Ex. 15, p. 1.)  From there, Dr. Cascio worked as a clinical instructor at LSU Department of Orthopaedic Surgery from 2007 to 2009, before moving on to become Medical Director of Sports Medicine at Lake Charles Memorial Hospital.  (Ex. 13, p. 1.)  In 2021, Dr. Cascio went into private practice, and in 2023, he joined Imperial Health Partnership.  (*Id.*)  He has been the Head of Surgery at Lake Charles Memorial Hospital, and he maintains a position as Head of Surgery at Lake Christus Hospital.  (*Id.*)  Dr. Cascio is board certified in orthopaedic surgery with a specialty certification in sports medicine, and he maintains active medical licenses in Louisiana and Colorado.  (Ex. 15, pp. 1-2.)  Relevant here, Dr. Cascio has treated SIRVA patients and published several articles on the topic of shoulder surgery.  (Ex. 13, pp. 1-2.)

[6] Dr. Jeret received his medical degree with Distinction in Research from SUNY Health Science Center at Brooklyn in 1988, before going on to complete an internship at Maimonides Medical Center in Brooklyn, New York, in 1989, as well as a neurology residency and a clinical neurophysiology fellowship at SUNY Health Science Center in 1992 and 1993, respectively.  (Ex. 12, p. 1.)  Since then, Dr. Jeret has maintained an active private practice in South Shore of Long Island.  (*Id.*; Ex. 11, p. 2.)  He is also currently employed as an active physician in the neurology department at Optum, and he is on staff at Mount Sinai South Nassau Hospital and Mercy Medical Center.  (Ex. 12, p. 1; Ex. 11, p. 2.)  Dr. Jeret is board certified in neurology, and he maintains an active medical license in New York.  (Ex. 12, p. 1; Ex. 11, p. 1.)  In his clinical capacity, Dr. Jeret has "cared for approximately 29,000 unique patients, independently interpreted thousands of brain and spinal MRI scans, and performed approximately 6,000 EMG/NCV studies."  (Ex. 11, p. 1.)  He has also "published extensively on many areas of neurology."  (*Id.*)

Casio opines that petitioner's injury meets the Table SIRVA requirements.  (Ex. 13, pp. 9-10.)

Dr. Cascio also suggests that petitioner can alternatively substantiate a cause-in-fact claim.  (Ex. 13, p. 10.)  He observes that "[a] significant and well documented downside to vaccinations is a low but real risk of pain and stiffness in the shoulder especially if the vaccine is delivered into the shoulder bursa or rotator cuff."  (*Id*. at 5.)  He further explains that "[t]he vaccine is designed to be delivered to the muscle and when it is delivered to the bursa, the vaccine can cause inflammation.  This inflammation can become so severe that the patient develops bursitis and even adhesive capsulitis otherwise known as frozen shoulder."  (*Id*.)  Dr. Casio cites a number of cases from medical literature in which this process resulted in painful shoulder dysfunction with various diagnoses.  (*Id*. at 6-7.)  Noting in particular that the treating physicians documented the temporal relationship between petitioner's symptoms and his vaccination, Dr. Cascio opines that the onset of petitioner's shoulder pain "fits logically within the mechanism of injury."  (*Id.* at 10-11.)  Moreover, onset within 48 hours of vaccination "fits temporally within the medical literature that links vaccines to SIRVA injuries."  (*Id*. at 11.)  Therefore, Dr. Cascio concludes that petitioner can meet all three parts of the *Althen* test.  (*Id*. at 10-11.)

Respondent's experts disagree.  On respondent's behalf, orthopedist Geoffrey Abrams, M.D.,[7] opines that petitioner's history is not consistent with SIRVA.  (Ex. A, p. 9.)  He stresses that petitioner did not have any reduction in his range of motion for two years following vaccination and, moreover, the majority of his symptoms during that time, including pain, numbness, and tingling around the elbow, forearm, and hand, are more consistent with a neurogenic injury.  (*Id*.)  When petitioner did eventually demonstrate reduced range of motion at the shoulder, he was diagnosed with osteoarthritis, which is not known to result from vaccine administration.  (*Id*. at 6.)  Dr. Abrams questions Dr. Jeret's assessment, because he asserted that petitioner never showed definitive sensory loss, whereas Dr. Abrams notes that sensory loss and hyperreflexia were clearly documented.  (*Id*. at 7.)  Moreover, petitioner did have x-ray evidence of degeneration of the spine at C5-C7, which correlates to the distribution of his symptoms of numbness and tingling.  (*Id*. at 7-8.)  Respondent's neurology expert,

---

[7] Dr. Abrams received his medical degree from the University of California, San Diego, in 2007, before going on to complete a surgical internship in the Department of General Surgery and a residency in the Department of Orthopedic Surgery at Stanford University Hospital and Clinics in 2008 and 2012, respectively, followed by a fellowship in Orthopedic Sports Medicine at Rush University Medical Center in Chicago, Illinois, in 2013.  (Ex. B, pp. 1-2.)  From there, Dr. Abrams briefly worked as a clinical instructor at Rush University Medical Center, before accepting a position as an attending physician at Veterans Administration Hospital in Palo Alto, California, as well as an assistant professor in the Medical Center Line at Stanford University School of Medicine, in 2013.  (*Id*. at 1.)  He was eventually elevated to associate professor in 2021.  (*Id.*)  Dr. Abrams is board certified in orthopedic surgery with a subspecialty in orthopedic sports medicine, and he maintains an active medical license in California.  (*Id.* at 2.)  He has "a surgical practice focused on orthopedic conditions of the shoulder and [has] also published extensively on shoulder and other musculoskeletal pathology, with over 130 total peer-reviewed publications."  (Ex. A, p. 1.)

Dr. Brian Callaghan, M.D.,[8] in turn agreed that petitioner's diagnosis remains unclear, noting a lack of a clear evidence of either cervical radiculopathy or peripheral neuropathy, but he stressed that while petitioner's evolving presentation led to four different diagnoses (paresthesia, cervical radiculopathy vs peripheral neuropathy, numbness and tingling with tendonitis, and primary osteoarthritis), none of these were consistent with SIRVA and none of petitioner's treating physicians attributed his symptoms to his vaccination.  (Ex. C, pp. 5-6.)  In particular, Dr. Callaghan noted that petitioner's initial symptoms – apart from a temporary shoulder pain that went away with Tylenol – were numbness and tingling.  It was only in later treatment records that petitioner reported shoulder pain.  (*Id*. at 5.)  Moreover, the fact that petitioner's ultrasound revealed only mild capsular hypertrophy is also not consistent with SIRVA.  (*Id*.)  Dr. Callaghan also challenges Dr. Cascio's purported showing of causation-in-fact, stressing that it relies primarily on case reports and is effectively limited to evidence of temporal proximity to vaccination.  (*Id*. at 6.)

## V.    Analysis

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."[9]  § 300aa-13(b)(1).  However, the

---

[8] Dr. Callaghan received his medical degree from the University of Pennsylvania Medical Center in Philadelphia, Pennsylvania, in 2004, before going on to complete an internship and neurology residency at the University of Pennsylvania Medical Center in 2005 and 2008, respectively.  (Ex. D, p. 1.)  Dr. Callaghan went on to complete a postdoctoral neuromuscular fellowship and a second postdoctoral fellowship at the Center of Healthcare Research and Transformation Policy at the University of Michigan in Ann Arbor, Michigan, in 2009 and 2016, respectively.  (*Id.*)  In the interim, Dr. Callaghan taught in the neurology departments at the University of Michigan Health System and the VA Ann Arbor Healthcare System in Ann Arbor, Michigan.  (*Id.*)  He was eventually elevated to Professor of Neurology in 2023.  (*Id.* at 2.)  Dr. Callaghan is board certified in neurology and electrodiagnostic medicine, and he maintains an active medical license in Michigan.  (*Id.* at 1.)  In his research capacity, Dr. Callaghan has "published more than 150 articles with most focusing on neuropathy including the appropriate diagnostic evaluation and treatment."  (Ex. C, p. 1.)

[9] The Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  There is no presumption that medical records are accurate or complete as to all of a patient's physical conditions.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).  Afterall, "medical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed.

special master is then required to weigh all of the evidence presented. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence). The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (quoting Vaccine Rule 8) (citing § 300aa-12(d)(3)), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416-17.

### a. Table SIRVA

Turning to the specific requirements for a Table SIRVA, I find that in this case petitioner cannot meet his preponderant burden of proof under either the third or fourth SIRVA QAI criteria. This is dispositive of his Table claim.[10]

The third SIRVA criterion requires that the post-vaccination pain and reduced range of motion be limited to the affected shoulder. 42 C.F.R. § 100.3(c)(10)(III). This requirement encompasses an affirmative showing that the petitioner's presentation included a reduction in range of motion. *Bolick v. Sec'y of Health & Human Servs.*, No. 20-893V, 2023 WL 8187307, at *6-8 (Fed. Cl. Spec. Mstr. Oct. 19, 2023). However, reduced range of motion need not arise at the same time as shoulder pain. *Alley v. Sec'y of Health & Human Servs.*, No. 21-464V, 2025 WL 3230497, at *8 (Fed. Cl. Spec. Mstr. Oct. 14, 2025) (finding petitioner entitled to compensation for a Table SIRVA where reduced range of motion was first demonstrated nearly a year post-vaccination).

Otherwise, the third SIRVA criterion focuses on whether "the condition is localized to the shoulder." *Chu v. Sec'y of Health & Human Servs.*, 180 Fed. Cl. 37, 74 (2026) (emphasis omitted) (citing 82 Fed. Reg. 6294, 6296); *see also Grossmann v. Sec'y of Health & Human Servs.*, No. 18-00013V, 2022 WL 779666, at *15-16 (Fed. Cl. Spec. Mstr. Feb. 15, 2022); *Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QIA criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"). More specifically, in *Chu*, the Court of Federal Claims explained that the third SIRVA criterion does not indicate that "a petitioner experiencing pain in the shoulder in addition to pain elsewhere is foreclosed from entitlement because the pain

---

Cl. Spec. Mstr. July 18, 2006). "[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting lower court opinion), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied sub nom. Murphy v. Sullivan*, 506 U.S. 974 (1992).

[10] Although petitioner's Table SIRVA claim fails for reasons pertaining to the third and fourth SIRVA criteria, I note briefly in the interest of completeness that I am not persuaded by respondent's arguments relative to the first and second criteria. (ECF No. 34, pp. 9-11.) Accordingly, I do find that petitioner has met his burden of proof under the first two SIRVA criteria, though it is not ultimately necessary to go into detail as to the reasons for that conclusion.

is not limited *only* to the shoulder."  180 Fed. Cl. at 74.  Rather, "so long as petitioner has *one* condition localized to the shoulder, SIRVA is satisfied."  *Id*.

In this case, petitioner did eventually have reduced range of motion documented by his orthopedist about two years after the initial onset of his condition.  Thus, contrary to Dr. Abrams's suggestion (Ex. A, p. 6), petitioner's showing under SIRVA QAI criterion three is not confounded by a lack of reduced range of motion.  *Accord Alley*, *supra*.  However, the third QAI criterion does otherwise require a condition localized to the shoulder.  No such condition is evidenced here.  Although Dr. Cascio and Dr. Jeret both note that shoulder dysfunction can result in symptoms extending distally to the extremity (Ex. 13, p. 9; Ex. 11, p. 6), they have not actually identified any shoulder dysfunction to explain petitioner's symptoms.  Instead, the medical records repeatedly reflect that for months after petitioner's vaccination, while he was reporting symptoms of pain, numbness, and tingling throughout his arm and down into his hand, physical examinations detected no discernable shoulder dysfunction.  (Ex. 1, p. 39 (November 14, 2019 exam of shoulder showing no abnormality); *id.* at 29-30 (January 29, 2020 physical exam unremarkable); Ex. 8, pp. 8-9 (July 16, 2020 physical exam normal except for findings referrable to the hand, biceps, and brachioradialis); Ex. 4, pp. 22-23, 42-43 (September 9, 2020 encounter and follow up exam with no documented physical exam abnormalities).  Moreover, as Dr. Callaghan stressed, petitioner's diagnosis remains unclear.  (Ex. C, p. 5.)  Given the lack of a clear diagnosis, the lack of any consistent evidence of shoulder pathology, and the prominence of symptoms affecting the arm, forearm, wrist, and hand, the evidence does not preponderate in favor of a finding that a condition localized to petitioner's left shoulder can be discerned.

The fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  42 C.F.R. § 100.3(c)(10)(iv).  This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole."  *Record v. Sec'y of Health & Human Servs*., 175 Fed. Cl. 673, 680 (2025).  While the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation."  *French v. Sec'y of Health & Human Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sep. 27, 2023).  Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis.  *Durham v. Sec'y of Health & Human Servs*., No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

Dr. Abrams is persuasive in opining that petitioner's primary symptoms throughout much of his treatment history were "more neurogenic in nature."  (Ex. A, p. 9.)  Although Dr. Callaghan agrees on respondent's behalf that petitioner's diagnosis is not clear (Ex. C), Dr. Jeret is not persuasive in stating definitively that "[t]here was no neurological injury" (Ex. 11, p. 6).  In particular, as Dr. Abrams notes, Dr. Jeret did not adequately address the medical record evidence of sensory loss, noted to be in the

12

ulnar nerve distribution, and hyperreflexia in the biceps and brachioradialis (Ex. A, p. 7 (citing Ex. 8, p. 8)), which he further noted to correlate to x-ray findings of cervical spinal degeneration at C5-C7 (*Id.* at 7-8 (citing Ex 1, p. 29).)  And, although I do take particular note of the negative EMG/NCS, Dr. Jeret has not substantiated that this is dispositive. For example, Dr. Callaghan notes that an earlier EMG/NCS may have been different. (Ex. C, p. 5.)  Thus, I am not persuaded that Dr. Jeret has reasonably ruled out a neurologic etiology for petitioner's symptoms.  Moreover, even as objective evidence of a neurologic injury is very limited, the same is true for any shoulder injury as well.  And, even as Dr. Callaghan noted that petitioner's work up was limited in important respects, a majority of the treating physician diagnoses for petitioner's symptoms were neurologic conditions.  (*Id.* (noting, *inter alia*, working diagnoses of paresthesia, possible cervical radiculopathy, neuropathy, and numbness and tingling).)  Thus, although petitioner did at times receive orthopedic diagnoses (namely, tendonitis at one encounter and osteoarthritis at another), this is not a case in which potentially confounding signs of a neurologic condition are merely incidental to what was otherwise treated as a shoulder injury.  Instead, while only minimal evidence supports any shoulder pathology, petitioner's treatment records predominantly assess petitioner's symptoms as likely to be neurologic.  Therefore, petitioner cannot reasonably contend that "[n]o other condition or abnormality is present that would explain the patient's symptoms."  42 C.F.R. § 100.3(c)(10)(iv).  The fact that petitioner does not have a clear diagnosis for his likely neurologic symptoms does not indicate otherwise.  *Accord Durham*, *supra*.

      b.  <u>Causation-in-Fact</u>

To demonstrate causation-in-fact, petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury.  *Althen*, 418 F.3d at 1278.  Moreover, such a claim must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1). That medical opinion must be based on sound and reliable scientific or medical reasoning.  *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359-60 (Fed. Cir. 2019).

With respect to *Althen* prong one, Dr. Casio theorizes that "[t]he vaccine is designed to be delivered to the muscle and when it is delivered to the bursa, the vaccine can cause inflammation.  This inflammation can become so severe that the patient develops bursitis and even adhesive capsulitis otherwise known as frozen shoulder."  (Ex. 13, p. 5.)  He then suggests by reference to various case reports and case series that this process can cause other aspects of the shoulder structure to become painful.  (*Id*. at 6-7.)  I am not persuaded by Dr. Callaghan's challenge to this reasoning.  (Ex. C, p. 6.)  Accordingly, petitioner has satisfied *Althen* prong one.

With respect to *Althen* prong three, Dr. Cascio suggests that the relevant timeframe for onset suggested by the medical literature is 48 hours.  (Ex. 13, p. 10.)  I accept that contention.  Moreover, although the medical records are not completely

uniform in describing the onset of shoulder pain, I find that they reasonably corroborate petitioner's written statement, which described his pain as beginning the day after his vaccination. (*Compare* Ex. 2, p. 2, *with* Ex. 1, p. 39.) In any event, the first time petitioner sought treatment for his condition he stated that the pain started "a couple days" after his vaccination, which can fairly be interpreted as indicating an approximately 48-hour onset. (Ex. 1, p. 39.) Accordingly, petitioner has satisfied *Althen* prong three.

However, despite having satisfied *Althen* prongs one and three, petitioner cannot meet his burden of proof under *Althen* prong two. Although satisfaction of *Althen* prongs one and three is probative with respect to *Althen* prong two, the Federal Circuit has cautioned that the second *Althen* prong "is not without meaning." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1326-27 (Fed. Cir. 2006). The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine. A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

*Id.* at 1327.

In this case, there are several reasons for concluding that petitioner has not met his burden under *Althen* prong two. First, Dr. Cascio explicitly premised his theory on the development of bursitis and/or adhesive capsulitis. However, there is no evidence of record to suggest that petitioner suffered either of these conditions. Second, to the extent the record evidence supports any orthopedic condition, it most clearly evidences osteoarthritis as petitioner's likely shoulder condition. This is based on a positive cross arm test (Ex. 7, p. 41), an x-ray finding of moderate degenerative joint disease (Ex. 6, p. 10), the treating orthopedist's diagnosis of osteoarthritis (*Id.*), and Dr. Cascio's concession that the diagnosis of osteoarthritis is at least partially correct (Ex. 13, p. 5). However, Dr. Cascio has not articulated how his theory of causation could be applied to osteoarthritis, which is otherwise understood to be a degenerative condition. Third, for the reasons discussed above relative to petitioner's Table Injury claim, petitioner's correct diagnosis (or diagnoses) remains unclear and a neurologic etiology has not been ruled out. Fourth, petitioner's earlier presentation appears to have been more consistent with a neurologic condition, whereas the earliest potential objective evidence of a shoulder pathology, the positive cross arm test, was not detected until June of 2021, more than eight months after the date of his vaccination. (Ex. 7, p. 41.) And, finally, none of petitioner's treating physicians actually attributed his symptoms to his vaccination.

14

All of this leaves only the temporal association between the onset of petitioner's shoulder pain – sans any clearly diagnosed explanation – and his vaccination.  In that regard, Dr. Cascio states that "acute onset of cervical radicular symptoms (an issue with the neck) while seated and receiving a vaccination into the deltoid (a superficial shoulder muscle) is exceedingly unlikely and improbable." (Ex. 13, p. 9.)  However, Dr. Cascio's attempt to present this as an improbable coincidence is not credible.  Dr. Cascio suggests that petitioner experienced an onset of acute symptoms of cervical radiculopathy while literally in the midst of receiving his vaccination.  However, not even petitioner's own written statement makes such a claim.  Petitioner stated that his symptoms began the day after his vaccination (Ex. 2, p. 2) and his earliest reports indicated that onset occurred "a couple" or "[a] few" days after the vaccination (Ex. 1, pp. 39, 43).  While this still could be fairly characterized as a coincidence, it does not amount to an improbable one.  Apart from noting that symptoms arose close in time to vaccination, Dr. Cascio has not substantiated that an acute onset would be inconsistent with a neurologic injury, such as a cervical radiculopathy.  "Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278.

## VI.    Conclusion

Petitioner clearly suffered and he does have my sympathy.  However, for all the reasons discussed above, there is not preponderant evidence of any compensable injury under the standards set by this Program.  Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation.  Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

15